UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Pawel Wroblewski,

           Plaintiff,                    **MEMORANDUM OPINION
AND ORDER**

v.                          Civil No. 12-910 ADM/FLN

Daryl R. McKenna,
Timothy J. Mattsson, and
City of Minneapolis,

           Defendants.

---

Steven E. Uhr, Esq., Edina, MN, on behalf of Plaintiff.

Timothy S. Skarda, Esq., and Sarah C. S. McLaren, Esq., Minneapolis City Attorney's Office, Minneapolis, MN, on behalf of Defendants.

---

## I. INTRODUCTION

On September 5, 2013, the undersigned United States District Judge heard oral argument on Defendants City of Minneapolis, Officer Daryl R. McKenna ("McKenna"), and Sergeant Timothy J. Mattsson's ("Mattsson") Motion for Summary Judgment [Docket No. 10]. Plaintiff Pawel Wroblewski ("Wroblewski") opposes the motion. For the reasons stated below, Defendants' motion is granted.

## II. BACKGROUND[1]

At approximately 7:30 p.m. on the evening of December 6, 2011, a robbery took place at Loon Grocery, located at 2501 South Lyndale Avenue in Minneapolis. Notice of Removal [Docket No. 1] Ex. 2 ("Complaint") ¶ 6; Timothy Skarda Aff. [Docket No. 14] Ex. 1 ("Incident

---

[1] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

Report"), at 1. Sgt. Mattsson was in the neighborhood of the grocery, when at 7:32 p.m., he received the initial description of the robbery suspect: white male, 25-27 years old, black stocking cap, black sweatshirt and blue jeans. Mattsson received a further report that the suspect was on foot eastbound and then possibly northbound. At approximately 7:36 p.m. Mattsson observed an individual later determined to be Wroblewski walking eastbound on 26th street, 6.5 blocks southeast of the Loon Grocery.[2] Id.; Mattsson Decl. [Docket No. 13] Ex. 3.

Mattsson turned his squad car's spotlight on Wroblewski. Steven Uhr Aff. [Docket No. 17] Ex. 2 ("Wroblewski Dep.") 25:24. Wroblewski turned and stopped as Mattsson pulled up beside him. Id. at 25:25–26:4. Mattsson asked Wroblewski, "Where are you going? Why are you here?" Id. at 26:13-14. Wroblewski told the officer, "That's really not any of your business, what I'm doing here and where I'm going." Id. at 26:14-15. Mattsson continued to question Wroblewski; Mattsson asked Wroblewski to identify himself and told Wroblewski that he looked "exactly like someone that committed a robbery." Id. at 26:25–27:4. Wroblewski said, "It definitely is not me." Id. at 27:5. According to Wroblewski, Mattsson then got out of his squad car and continued to ask Wroblewski questions about his identity and where he was going. Id. at 27:6-7. Wroblewski did not answer Mattsson's questions and asked if he could call his attorney; Mattsson told him he could not call his attorney. Id. at 27:7-11. At this point, Wroblewski told Mattsson that he was not going to answer any of Mattsson's questions. Id. at 27:15-17.

Wroblewski is a white male, 30 years old, 5'9", and was wearing dark sweatpants and a zippered North Face jacket on the night of the incident. In addition, Wroblewski was carrying a rock-climbing harness. Wroblewski was going to Vertical Endeavors, a rock climbing facility

---

[2] Plaintiff is not challenging the initial interaction between Mattsson and Plaintiff. Mem. Opp'n [Docket No. 15] 11. Plaintiff concedes that the initial stop may have been justified.

located on the corner of 25th Street and Nicollet Avenue. At 7:38 p.m., a second description of the suspect was broadcast: white male, in his 20's, height 6'1", clean shaven, wearing all black, black cap, black jacket-jeans, dirty looking. Incident Rpt. at 2. Mattsson noted Wroblewski had a dark jacket with a "North Face" logo, so Mattsson radioed to ask if the officers at Loon Grocery knew if the robber "had any markings on his coat." Uhr Aff. ¶ 1. The officers at the store responded that the clerk "doesn't believe so but not 100% sure." Id.

Officer McKenna then arrived on the scene of the stop and approached Wroblewski from behind. Wroblewski said he wanted to call his attorney and moved his hand toward his pocket to retrieve his phone. Wroblewski Dep. at 29:5-7. Mattsson told Wroblewski not to put his hands in his pockets. Id. at 29:8-10. Wroblewski put his harness and his other belongs down on the ground. McKenna applied handcuffs and then searched Wroblewski's pockets, removing Wroblewski's cellphone and keys.[3] Id. at 29:21–30:6. Wroblewski was placed in the back of McKenna's squad car. Wroblewski claims McKenna used profanity repeatedly even after Wroblewski asked him to stop. McKenna also allegedly told Wroblewski that he was legally obligated to identify himself. Wroblewski complained repeatedly that the cuffs were too tight. McKenna did not check the handcuffs and did not loosen them.

At 7:55 p.m., Mattsson radioed Loon Grocery to set up a "show up" where the victim would observe the suspect to see if the suspect was the robber. Incident Rpt. at 2. An officer volunteered to pick up the victim clerk and bring him to see if he recognized Wroblewski. By 8:01 p.m. the clerk had arrived, McKenna had taken Wroblewski out of the squad car, and the clerk indicated that Wroblewski was not the robber. Id. McKenna had Wroblewski return to

---

[3] Mattsson claims Officer McKenna placed Wroblewski in handcuffs because Wroblewski pulled away before McKenna had an opportunity to do a full pat search.

3

the squad car, still handcuffed.  Wroblewski Dep. 33:18.  McKenna argues that he was considering citing Wroblewski for obstruction of legal process and could not do so unless Wroblewski identified himself.  Wroblewski was not told about the possible obstruction charge; he recalls McKenna continuing to use profanity and telling him that he was being held because he was also a suspect in another robbery.  Id. at 34:15-24.  Another officer had allegedly already told McKenna that Wroblewski did not resemble the suspect description in that other case.  The exact order of events and statements following the "show up" is unclear, but Wroblewski claims McKenna told him that if he did not identify himself, then he would be taken to the police station.  Id. at 34:23–35:18.  At that point Wroblewski gave his name.  Id.  McKenna checked Wroblewski's name in the police database and then released him.  Wroblewski was released within 5 minutes of the victim clerk's failing to identify Wroblewski as the robber.  Incident Rpt. at 2.

From these events, Wroblewski alleges injury to his right wrist in the form of a tingling sensation.  Compl. ¶ 26; Wroblewski Dep. at 10.  Weeks later, on December 30, 2011, Wroblewski received medical care from Brandy L. Utter, M.D.  Uhr Aff. Ex. 9.  The doctor conducted a variety of tests on Wroblewski's wrist and recommended wearing a brace, resting, stretching, and taking some non-prescription strength pain medication.  Id.  The doctor wrote, "If no improvement in 2-3 weeks, he will need to follow up."  Id.  No further medical reports have been provided.[4]

---

[4] Plaintiff directs the Court to Uhr Aff. Ex. 10, but no such exhibit exists in the record. The only medical report provided to the court is Ex. 9.

## III. DISCUSSION

### A. Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig, 54 F.3d at 470. The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

### B. 42 U.S.C. § 1983 Claim Against McKenna and Mattsson

"Section 1983 imposes liability for certain actions taken 'under color of' state law that deprive a person 'of a right secured by the Constitution and laws of the United States.'" Dossett v. First State Bank, 399 F.3d 940, 947 (8th Cir. 2005) (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 931 (1982)).

Wroblewski claims Mattsson and McKenna (the "Officers"), detained him without lawful justification or reasonable suspicion. Wroblewski argues Mattsson and McKenna violated his rights by detaining him for an unreasonably long time, by searching his pockets without consent, by placing him in handcuffs that were too tight and refusing to loosen them, and finally, by using profanity and verbally abusing him during the detention. Compl. ¶¶ 46-49. Wroblewski also

alleges that this conduct was willful and in bad faith. Id. at ¶ 50. Defendants claim they are entitled to qualified immunity.

The standard for assessing qualified immunity is one of "objective legal reasonableness." Winters v. Adams, 254 F.3d 758, 766 (8th Cir. 2001) (citing Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982)). The first question is whether, viewing the facts in the light most favorable to the party asserting the injury, the officer's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled in part, Pearson v. Callahan, 129 S. Ct. 808, 818 (2009). If the first question is answered in the affirmative, the second question is whether the right violated was clearly established.[5] Id. "Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that the defendant should have taken the disputed action." Winters, 254 F.3d at 766. "Whether a given set of facts entitles the official to summary judgment on qualified immunity grounds is a question of law." Greiner v. City of Champlin, 27 F.3d 1346, 1352 (8th Cir. 1994).

**1. Terry Stop**

The Fourth Amendment protects citizens against unreasonable searches and seizures, even when the seizure does not result in prosecution for a crime. Terry v. Ohio, 392 U.S. 1, 16 (1968).[6] However, if an officer has reasonable articulable suspicion a person has committed or is

---

[5] In Pearson, the Supreme Court ruled that courts have the discretion to evaluate the second question before deciding the first question. See Pearson, 129 S.Ct. at 818.

[6] Chief Justice Earl Warren candidly held that the interaction of police and citizen on the street "thrusts to the fore difficult and troublesome issues." Terry, 392 U.S. at 9. On the one hand, "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." Id. On the other hand the police have been tasked with "rapidly unfolding and often dangerous situations on city streets" and are called upon to act in the interest of effective law enforcement. Id. at 10.

about to commit a crime, then a police officer may temporarily seize a suspect for the purpose of questioning. Florida v. Royer, 460 U.S. 491, 498 (1983) (citing United States v. Brignoni-Ponce, 422 U.S. 873, 881-82 (1975)); United States v. Morgan, 729 F.3d 1086, 1089 (8th Cir. 2013) (citing United States v. Sokolow, 490 U.S. 1, 7 (1989)).

"Officers should employ the least intrusive means reasonably available to verify or dispel their suspicions." Morgan, 729 F.3d at 1091. But, when confronted with a potentially dangerous suspect or a suspect that may flee, then handcuffing and confining a suspect to a police officer's squad car awaiting a "show up" can be reasonable, and does not change a Terry stop into an arrest. See Michigan v. Summers, 452 U.S. 692, 702 (1981); and see United States v. Martinez, 462 F.3d 903, 908 (8th Cir. 2006); El-Ghazzawy v. Berthiaume, 636 F.3d 452, 457 (8th Cir. 2011) (the use of handcuffs "requires some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose, evaluated on the facts of each case").

In the circumstances of this case, the limits of a Terry stop were not exceeded when Wroblewski was handcuffed and placed in a squad car to await the "show up." Wroblewski is not challenging his initial interaction with Mattsson. Mem. Opp'n [Docket No. 15] 11. Wroblewski concedes the initial Terry stop may have been justified by reasonable suspicion. But, even so, Wroblewski argues Mattsson violated the scope limitation of Terry. First, Wroblewski argues that once Mattsson exited his vehicle and got a closer look at Wroblewski, it was clear that he looked nothing like the description of the robbery suspect. Second, Wroblewski argues the officers did not need such a long time to dispel their suspicions. Id. Finally, Wroblewski argues the officers intruded on his personal liberty by handcuffing and searching him.

Mattsson had reasonable suspicion Wroblewski was the Loon Grocery robbery suspect

7

because Wroblewski was on foot, only blocks away from Loon Grocery, and walking eastbound. Furthermore, the radioed descriptions were not so different from Mattsson's observations of Wroblewski. The first description reported the suspect as a white male, 25-27 years old, black stocking cap, black sweatshirt, and blue jeans. The second description changed slightly, describing the suspect as in his mid-20's, height 6'1", clean shaven, wearing all black, black jacket-jeans, dirty-looking. Wroblewski was a 30 year old, white male, was wearing dark clothes not unreasonably different from the descriptions radioed, and was sufficiently tall to prevent elimination from the suspicion on that basis. Wroblewski argues that Mattsson should have released him as soon as Mattsson saw that Wroblewski was wearing a dark blue North Face jacket and dark sweatpants, instead of a black sweatshirt and blue jeans. At night, black clothing, dark clothing, and blue jeans may be easily confused. Mattsson did note the North Face logo and radioed to an officer at Loon Grocery, but the clerk was "not 100% sure" about further specifics of what the robbery suspect was wearing. Mattsson made a reasonable decision to wait on releasing Wroblewski until he had more definite information.

Mattsson and McKenna's task of dispelling their suspicions was made more difficult by Wroblewski himself. When he approached Wroblewski, Mattsson asked Wroblewski where he was going and why he was in the neighborhood. Wroblewski decided not to respond to Mattsson and McKenna, as was his right. See Berkemer v. McCarty, 468 U.S. 420, 439 (1984). But, Wroblewski's decision prevented Mattsson and McKenna from using the quickest means of dispelling their suspicions. Wroblewski could have told Mattsson that his car was parked nearby and that his driver's license was inside. The Officers, when they could not get answers from Wroblewski, decided a "show up" would be the most efficient way to confirm or dispel suspicion. See Martinez, 462 F.3d at 908. Mattsson stopped Wroblewski at approximately 7:38 p.m. By 8:01 p.m., the "show up" was conducted. Less than 25 minutes is not an unreasonably

long time for an officer to conduct a "show up" when the scene of the crime is 6.5 blocks away and the suspect exercised his constitutional right not to respond to police questions.[7] In addition, "there is no evidence that any of the law enforcement officers were dilatory in their investigation or that there was an unnecessary delay" in bringing the clerk to the "show up." See Kaleta v. Johnson, No. 12-170, 2013 U.S. Dist. LEXIS 95116, at *41 (D. Minn. July 9, 2013) (citing United States v. Maltais, 403 F.3d 550, 557 (8th Cir. 2005)).

Finally, the Officers were responding to a reported robbery and were looking for a suspect fleeing the scene of the crime. Although no weapon was reportedly used at Loon Grocery, the officers were reasonably cautious because robbery is a felony and a crime of violence. Minn. Stat. §§ 609.24 and 624.712. The Officers also reported that Wroblewski was agitated and was holding something in his hands. Wroblewski claims that he asked to call his attorney and moved his hand toward the cellphone in his pocket. Mattsson, nervous Wroblewski might have a weapon in his pocket, told him not to do that. Wroblewski claims he complied with Mattsson's orders and kept his hands away from his pockets. Wrobelwski maintains that he was calm throughout the interaction, but admits that when McKenna approached him from behind, he may have "flinched" as McKenna began to pat him down for weapons. McKenna claims Wroblewski pulled away, at which point he decided to put on the handcuffs to complete the pat down. Either way, in responding to the robbery, the Officers were reasonable in wanting to maintain the status quo for their investigation, protect themselves from a possible weapon, and prevent Wroblewski from walking away. In sum, stopping Wroblewski and detaining and handcuffing him constituted a seizure, but was, under the totality of circumstances, objectively

---

[7] Wroblewski argues that he should have been transported to the store for the "show up," rather than waiting for an officer to pick up the clerk and conduct the "show up" at the stop location. Whether this would have saved time is debatable, as Wroblewski, would have needed to be transported later, back to the scene of the stop. Given the short time-frame, the Court declines to second guess the officer's decision not to transport the suspect.

reasonable.

   **2. Excessive Force**

When an excessive force claim "arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment." Graham v. Connor, 490 U.S. 386, 394 (1989). As such, force used in the course of an arrest must be reasonable. Id. at 395-96. The officer's use of force must be viewed in context, with "careful attention to the facts and circumstances" of the case at hand. Id. at 396. The use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. If an officer's actions are objectively reasonable, qualified immunity will prevent liability. Id. at 397.

The Eighth Circuit Court of Appeals recently clarified how courts in this district evaluate the use of force during an arrest. See Chambers v. Pennycock, 641 F.3d 898, 905-08 (8th Cir. 2011). It is well established that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id. at 905 (internal quotation omitted). "Police officers undoubtedly have a right to use some degree of physical force . . . to effect a lawful seizure, and reasonable applications of force may well cause pain or minor injuries with some frequency." Id. at 907 (citation omitted). "It remains firmly established that '[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.'" Id. (quoting Graham, 490 U.S. 396). "Resistance may justify the use of greater force." Crumley v. City of St. Paul, Minn., 324 F.3d 1003, 1008 (8th Cir. 2003). "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." Saucier, 533 U.S. at 205.

Mattsson was five to ten feet from Wroblewski and did not use any force against

Wroblewski. It was McKenna who applied the handcuffs and took Wroblewski to his squad car. Therefore Mattsson is not reasonably implicated in Wroblewski's excessive force claims.

As for McKenna's actions, placing Wroblewski in handcuffs was objectively reasonable; therefore the only remaining question is whether the force used was excessive.[8] "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the 'nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing government interests at stake." Graham, 490 U.S. at 396. "Handcuffing inevitably involves some use of force and it almost inevitably will result in some irritation, minor injury, or discomfort where the handcuffs are applied." Chambers, 641 F.3d at 907 (internal quotations and citations omitted).

In this case, the government interest was in apprehending a robbery suspect. On the other hand, Wroblewski claims the handcuffs were too tight, caused abrasions on his right wrist, and he continues to experience tingling in his right hand which interferes with his day-to-day activities. In support of his claims, Wroblewski has submitted one medical report. The doctor's exam, on December 30, 2011, resulted in a recommendation for over the counter pain medicine and rest. The medical report recommended Wroblewski return in 2-3 weeks if the wrist continued to bother him. Wroblewski has provided no evidence of subsequent medical treatment. Wroblewski also claims McKenna swore at him and was verbally abusive. There is no evidence that McKenna's profanity had any serious impact on Wroblewski.

---

[8] Wroblewski claims that during the course of McKenna's pat down of Wroblewski, McKenna removed Wroblewski's cellphone from his pocket and placed it on the hood of the squad car. McKenna denies that he removed Wroblewski's cellphone and testifies that he knows a Terry frisk is limited to a pat down for weapons, restricted to the outside of a suspect's clothing. In a criminal case, where the cellphone was the fruit of an improper Terry frisk, the remedy, if the accusation was credited, would be exclusion of the evidence from trial. In this civil case however, this dispute is not a material question of fact. There is no indication that Wroblewski or his cellphone were damaged in any way by the removal of the cellphone from his pocket; therefore, the issue cannot affect monetary damages or officer liability.

The Court does not wish to make light of Wroblewski's claims.  McKenna may well have been mistaken about the threat Wroblewski posed to him and the other officers.  And if McKenna did use profanity as claimed in the execution of his duties, it was unnecessary and unhelpful in these circumstances.  But even taking everything Wroblewski claims as true, McKenna's conduct does not rise to the level of excessive force given the circumstances.

### 3.  Further Detention

It is difficult to imagine what damages stem from Wroblewski's final complaint about the scope of his Terry investigation.  Even so, the Court will address McKenna's continued detention of Wroblewski following the negative "show up."  Wroblewski argues that following the negative "show up," McKenna should have immediately released him, rather than detaining him for an additional five minutes.

There is no bright line rule for limiting the scope of a Terry stop; instead, "common sense and ordinary human experience must govern over rigid criteria."  Morgan, 729 F.3d at 1091 (citing United States v. Sharpe, 470 U.S. 675, 686 (1985)).   An investigative detention only turns into an arrest if it lasts an "unreasonably long time."  United States v. Donnelly, 475 F.3d 946, 952 (8th Cir. 2007).  In this case, McKenna had a duty to throughly investigate the robbery of Loon Grocery.  After a negative "show up," it is still reasonable for an officer to try and identify the suspect at hand.  If the clerk at the grocery store had been too nervous to identify the suspect face to face at the "show up," but decided to identify the individual privately the next day, McKenna would have no way to track down Wroblewski without his identity.  Therefore, common sense dictates that an additional 5 minutes of detention did not extend Wroblewski's detention an unreasonably long time.

### 4.  Individual or Official Capacity

Wroblewski's individual liability claims against Mattsson and McKenna are dismissed on

12

an alternative ground. Claims under § 1983 may be made against a defendant in either an individual or official capacity. "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law." Kentucky v. Graham, 473 U.S. 159, 165 (1985) (citation omitted). "Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" Id. at 165-66 (citing Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 690 n.55 (1978)). See, Section III.C below. The Eighth Circuit has established a bright line rule, that plaintiff must sue public officials in their individual capacity or it will be assumed that the official is sued in his official capacity. Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999). As the Eighth Circuit has explained, public servants are entitled to proper notice that they may be exposed to civil liability and damages. Id.; see also Egerdahl v. Hibbing Cmty. Coll., 72 F.3d 615, 619-20 (8th Cir. 1995), and Lopez-Buric v. Notch, 168 F. Supp. 2d 1046, 1050 (D. Minn. 2001) (the case law in this circuit is sufficiently clear that plaintiff must include unambiguous language in his complaint noting that the defendants are sued in their individual capacity); but cf. McKenzie v. Frokjer, No. 07-3413, 2009 U.S. Dist. LEXIS 45627 (D. Minn. Feb. 23, 2009). Wroblewski did not indicate in his complaint that the Officers were sued in their individual capacity.[9]

## C. Section 1983 Claims Against City of Minneapolis

Under § 1983, a plaintiff may sue a city, and a city's employees in their official capacity, for a deprivation of constitutional rights if the City took formal action to cause the violation. A

---

[9] The government did not raise this argument as grounds for dismissal, but this only demonstrates the need for the rule. In official capacity suits, the assumption is that officers are named in the suit only as officers or agents of the public entity. In that case, attorneys for the public entity can easily make arguments for the public entity employing the individuals. But individual capacity suits implicate qualified immunity defenses separate from the public entity's defenses and individuals so sued should have the opportunity to hire counsel to represent them. See Lopez-Buric, 168 F. Supp. 2d at 1050.

formal action, or policy, is one that "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the City's] officers." Monell, 436 U.S. at 690. In addition to an officially adopted policy, liability may attach to a City for constitutional violations that result from "custom," even though the City may not have formally approved the custom. See id.; see also Kuha v. City of Minnetonka, 365 F.3d 590, 603 (8th Cir. 2003), abrogated in part on other grounds, Szabala v. City of Brooklyn Park, 486 F.3d 385 (8th Cir. 2007).

Eighth Circuit courts have consistently recognized a difference between a city's official "policies" and its "customs." Absent an official policy, a plaintiff must identify a "custom or usage" that caused the alleged violation. See Kuha, 365 F.3d at 603-04. A "custom or usage" is demonstrated by:

> (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the city's employees;
>
> (2) deliberate indifference to or tacit authorization of such conduct by the city's policymaking officials after notice to the officials of that misconduct; and
>
> (3) the plaintiff's injury by acts pursuant to the governmental entity's custom, i.e., proof that the custom was the moving force behind the constitutional violation.

See id. (citing Jane Doe A v. Special Sch. Dist., 901 F.2d 642, 646 (8th Cir. 1990)). To demonstrate Minneapolis's liability under a Monell claim, Wroblewski must show that a policy or custom of Minneapolis was the "moving force [behind] the constitutional violation." Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999) (citation omitted).

Here, the Monell claim fails because no constitutional right was violated and Wroblewski has presented no evidence of a Minneapolis police policy or custom that could have been the moving force behind Mattsson or McKenna's decisions. Therefore, no § 1983 municipal liability can apply.

**D. State Tort Claims**

In addition to his claims under § 1983, Wroblewski asserts claims of assault and battery (Count II), and false arrest/imprisonment (Count I) against Mattsson and McKenna.[10]

"[U]nder Minnesota law, a public official is entitled to official immunity from state law claims when that official is charged by law with duties that require the exercise of judgment or discretion." Johnson v. Morris, 453 N.W.2d 31, 41 (Minn. 1990). Law enforcement officers are "generally classified as discretionary officers who may be entitled to official immunity." Nelson v. Cnty. of Wright, 162 F.3d 986, 991 (8th Cir. 1998) (citing Johnson, 453 N.W.2d at 42). "[A] public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong." Elwood v. Rice Cnty., 423 N.W.2d 671, 677 (Minn. 1988).

**1. Assault and Battery**

Under Minnesota law, to establish a claim of assault and battery against an on-duty officer, Wroblewski must demonstrate that an officer used excessive force to effectuate the arrest. Paradise v. City of Minneapolis, 297 N.W.2d 152, 155 (Minn. 1980). As previously discussed, excessive force was not used in the detention of Wroblewski. As a result, his assault and battery claim fails.

**2. False Imprisonment**

Wroblewski also claims that Defendants falsely imprisoned him. However, if Wroblewski's detention was reasonable, a claim for false imprisonment cannot stand. Johnson, 453 N.W.2d at 36. Consequently, judgment will be entered for Defendants on Plaintiff's false

---

[10] Wroblewski has elected not to pursue his Intentional Infliction of Emotional Distress Claim (Count III). Mem. Opp'n 1.

15

imprisonment count.

## IV.  CONCLUSION

Based upon upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED:**

1. Defendants' Motion for Summary Judgment [Docket No. 10] is **GRANTED**; and,

2. All claims in the Complaint [Docket No. 1] are **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

BY THE COURT:


    s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  December 5, 2013.